***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Garner, and the briefs and oral arguments on appeal. The appealing party has shown good ground to reconsider the evidence. Having reconsidered the evidence of record, the Full Commission reverses the prior Opinion and Award and enters the following Opinion and Award.
 ***********
Based upon the evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. The plaintiff sustained an admittedly compensable injury by accident to her left knee on August 26, 1999. At the time of her injury, her average weekly wage was $209.51. The plaintiff was diagnosed with a left AVL tear and a medial meniscus tear. She began treating with Dr. Greg Motley, an orthopedic surgeon. On October 22, 1999, Dr. Motley released the plaintiff to return to work with her employer in a light duty position.
2. On January 11, 2000, the plaintiff was seen by Dr. Andrew Rudins. After an extensive examination, Dr. Rudins determined that if the plaintiff did not go through with the ACL reconstruction, she had reached maximum medical improvement. Furthermore, Dr. Rudins believed that the plaintiff had sustained a permanent partial impairment rating of 29% to her left leg.
3. After January 2000, the plaintiff continued with treatment while working in a light duty position. However, in December 2000, the plaintiff's physicians again recommended that she undergo an ACL reconstruction to relieve her complaints. This time the plaintiff agreed, and all of the medical expenses associated with the operation were paid for by the employer.
4. Prior to her surgery, the plaintiff was represented by Attorney William Eubanks. On March 8, 2000, Mr. Eubanks notified the Industrial Commission of his involvement and filed a Form 18 on the plaintiff's behalf. From March 8, 2000, forward, Mr. Eubanks communicated with defendant and the Commission on behalf of his client. However, in the weeks prior to April 23, 2001, the plaintiff released her attorney, and she began contacting the defendant directly. The plaintiff then began discussing settlement of her claim for specific sums of money.
5. After April 23, 2001, defense counsel responded to the plaintiff's requests to settle her claim. After several rounds of negotiations, the plaintiff decided to accept $24,000.00 to settle her workers' compensation claim.
6. On May 15, 2001, the plaintiff met with the defense counsel at defense counsel's Asheville office. There, the plaintiff was given the opportunity to review two settlement agreements. One was an agreement releasing the plaintiff's workers' compensations claims, and the other agreement was a so-called "Release of Employment Claims." As consideration for the "Release of Employment Claims," the plaintiff received $2000.00. The plaintiff first signed the "Release of Employment Claims," then signed the workers' compensation compromise settlement agreement.
7. On May 31, 2001, Deputy Commissioner Richard B. Ford issued an order approving the settlement of the plaintiff's workers compensation claim. Deputy Commissioner Ford's order specifically found that the agreement was fair and equitable and in the best interest of the parties to the plaintiff's workers' compensation claim. As ordered by Deputy Commissioner Ford, the defendant paid the plaintiff $24,000.00 pursuant to the agreement.
8. On September 26, 2001, over four months after the plaintiff executed the agreement, Attorney Leah Broker informed counsel for defendant that she was representing the plaintiff in a Social Security Disability claim. Sometime prior to October 17, 2001, Attorney Broker, on the plaintiff's behalf, asked counsel for defendant to execute a revised agreement that she had prepared. This revised agreement included a statement commonly referred to as "Social Security offset language." Counsel for defendant agreed and executed the revised agreement, and it was submitted to the Industrial Commission for approval. On October 17, 2001, Deputy Commissioner Brad Houser issued an Order approving the revised agreement.
9. On May 15, 2001, the plaintiff signed the "Release of Employment Claims" before she signed her workers' compensation compromise settlement agreement. After signing the "Release of Employment Claims" but before signing her workers' compensation compromise settlement agreement, a hospital called attempting to get authorization for a diagnostic procedure for the plaintiff's knee. The plaintiff knew that defendant would not pay for future knee treatment or procedures before she signed her workers' compensation compromise settlement agreement.
10. After settling her workers' compensation claim, the plaintiff cashed the $24,000.00 check. Subsequently, the plaintiff chose to undergo a subsequent knee procedure, paying for the procedure with her husband's health insurance. The plaintiff purchased an automobile in October 2001.
11. The fact that the plaintiff signed a "Release of Employment Claims" on the same day as she signed a separate compromise settlement agreement does not constitute fraud, misrepresentation, undue influence, or mutual mistake.
12. Based on the evidence of record, the Full Commission finds that there is no proof of fraud in this case by defendant or defendant's attorney.
13. Based on the evidence of record, the Full Commission finds that there is no evidence of misrepresentation in this case by defendant or defendant's attorney.
14. Based on the evidence of record, the Full Commission finds that there is no evidence of undue influence in this case by defendant or defendant's attorney.
15. Based on the evidence of record, the Full Commission finds that there is no mutual mistake of fact between the parties in this case.
16. The plaintiff accepted the funds from the workers' compensation compromise settlement agreement and has used them for her personal needs.
 ***********
Based on the foregoing findings of facts, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Under the Workers' Compensation Act, a Compromise Settlement Agreement may be set aside by the Industrial Commission only if it appears to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence, or mutual mistake. G.S. § 97-17. The plaintiff has failed to demonstrate that there has been error due to fraud, misrepresentation, undue influence or mutual mistake by any of the parties in this case. Id.
2. There is insufficient evidence to justify setting aside the Compromise Settlement Agreements in this case. The October 17, 2001 Compromise Settlement Agreement is valid and remains in effect against all parties. G.S. § 97-17.
 ***********
Based upon the foregoing findings of facts and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Under the law, employee-the plaintiff's claim to set aside the Compromise Settlement agreement must be, and the same is DENIED.
2. Each party shall pay its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER